411 P.2d 27

Roger C. HANKS, George D. Cook and Marion L. Martin, Appellants,

v.

Philip A. BORELLI, Phillip L. Brandon, Willard J. La Morte, Thomas V. Tozzi and Chief Consolidated Mining Company, a corporation, Appellees.

No. 2 CA–CIV 124.

Court of Appeals of Arizona.

Feb. 9, 1966.

Boyle, Bilby, Thompson & Shoenhair, by William A. Scanland, Tucson, for appellants.

Tognoni & Pugh, by Hale C. Tognoni, and William K. Strong, Phoenix, for appellees, Borelli, Brandon, La Morte and Tozzi.

MOLLOY, Judge.

Appellee, Chief Consolidated Mining Company, was originally incorporated under the laws of the Territory of Arizona in 1909, for a period of twenty-five years. In 1912, when the Constitution of the State of Arizona became effective, cumulative voting was made mandatory. Art. 14, § 10. Corporate existence was renewed in 1934 and again in 1958, pursuant to law (now A.R.S. § 10–151).

This is a declaratory judgment action to determine whether, as a matter of law, the cumulative voting provision of the Constitution applies to elections of directors of Chief Consolidated Mining Company. The trial court granted a motion for summary judgment holding that the subject corporation is bound by the cumulative voting provision. From that decision the com-

pany and individual shareholders have appealed.

The territorial law under which appellee-corporation was formed included provisions pertinent to our inquiry. Tit. 13, ch. 2, of the Code of 1901, included:

"765. (Sec. 5.) Among the powers of such bodies corporate shall be the following:

"1. To have perpetual succession."

\* \* \* \* \* \*

"771. (Sec. 11.) Corporations organized under this title may be formed to endure for twenty-five years, but they may be renewed from time to time for a period of not exceeding twenty-five years, when three-fourths of the votes cast at any stockholders' meeting duly called and held for that purpose shall be in favor of such renewal."

The articles of incorporation of appellee-corporation provided:

"The time of the commencement of this corporation shall be the date of filing a certified copy of these Articles of Incorporation in the office of the Territorial auditor of the Territory of Arizona, and *the termination thereof shall be twenty-five (25) years thereafter.*" (Emphasis added)

■ The "perpetual existence" mentioned in the Code need not concern us unduly, for, in spite of the apparent meaning of the words themselves, their legal significance is limited. The expression is clarified in the following extract from 18 C.J.S. Corporations § 78:

" \* \* \* *'perpetual succession'* means merely a potential, and not an actual, perpetuity; a capacity, as contradistinguished from partnerships and other voluntary associations, to continue in existence indefinitely, subject to constitutional or statutory limitations, notwithstanding the withdrawal or death of any of its members; and therefore a corporation will continue to exist, unless previously dissolved, during, but not beyond, the period to

which its existence is limited by its charter or by a general constitutional or statutory provision." (Emphasis added)

See also, 18 Am.Jur.2d Corporations § 65.

■ At the time of incorporation, cumulative voting was neither required by law nor included in the articles, and the right to vote cumulatively did not exist at common law. Bohannan v. Corporation Commission, 82 Ariz. 299, 313 P.2d 379 (1957), 19 Am.Jur.2d Corporations § 663. Subsequently, the Constitution of the State of Arizona became effective, including art. 14, § 10:

"Art. 14, § 10 Constitution of Arizona

"§ 10. Elections for directors or managers

"Section 10. In all elections for directors or managers of any corporation, each shareholder shall have the right to cast as many votes in the aggregate as he shall be entitled to vote in said company under its charter multiplied by the number of directors or managers to be elected at such election; and each shareholder may cast the whole number of votes, either in person or by proxy, for one candidate, or distribute such votes among two or more such candidates; and such directors or managers shall not be elected otherwise."

Statutes have been passed implementing the constitutional mandate (now A.R.S. § 10–271).

In 1933, the Arizona Supreme Court had occasion to skirt the question which we are now called upon to resolve. In Saylor v. Gray, 41 Ariz. 558, 566, 20 P.2d 441, 444 (1933), the court said:

"The defendant contends that the construction of the charter by this court in the Orme Case, supra, no longer obtains for the reason that the association on February 24, 1923, amended its charter by extending its life for twenty-five years from that date; that the effect of such amend-

ment was as though it had accepted from the state a new charter, subject to the laws of the state governing private corporations in existence at the time of renewal, and not the laws at the date of its original organization. This question is purely academic under the facts in this case and its decision therefore is not necessary. *If the association was engaged in the business of an ordinary private corporation, and if the renewal of its charter had the effect of accepting a new charter from the state, it may be conceded that its charter powers would be found in the laws in existence at the time of the renewal * * *."* (Emphasis added.)

■ We must now give direct answer to the question dealt with in the dicta of the Saylor case: whether the renewal of corporate existence has the effect of subjecting a corporation to laws in effect at the time of renewal which were not in effect at the time of original incorporation, in this case, specifically, mandatory cumulative voting for corporate directors. The resolution revolves around the decision of the United States Supreme Court in the classic case of Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 4 L.Ed. 629 (1819).

In the Dartmouth case, the British Crown had granted a charter to the trustees to operate an eleemosynary institution *forever*. After the American Revolution, the State of New Hampshire attempted, by legislative act, to alter the original charter to, in effect, give control of the college to the state government in the person of the governor. Chief Justice Marshall ruled, for the court, that the original charter was a contract, that by its terms "An artificial, *immortal* being, was created by the crown, * * *"* (emphasis added) and that the attempted legislative alteration would result in a new contract being forced upon the trustees contrary to the U.S.Const. art. 1, § 10, which requires that "No State shall * * * pass any * * * Law impair-

ing the Obligation of Contracts * * *." (Emphasis added)

The common law position that corporations, once created, existed forever, coupled with the Dartmouth holding that the charter constituted a contract which was constitutionally inviolable, created a troublesome anachronism whereby the state which granted life to the corporation was thereafter rendered helpless to effectively control its creation. The clue to avoiding such a situation was provided by the opinion of Justice Storey, concurring in the Dartmouth case. Justice Storey suggested that the Dartmouth holding was a binding and necessary conclusion *unless* the states had reserved to themselves the right to alter and amend the laws to which grants of corporate charters were subject. The states have taken the hint by (1) imposing limitations on the duration of corporate existence, and (2) by reserving the right to alter and amend corporate laws. The "reserve power" statutes have been upheld. See, generally, 7 Fletcher, Cyclopedia of Corporations, Perm.Ed., ch. 43, § 3670. The Arizona Constitution incorporated such a reservation in art. 14, § 2:

> "§ 2. Formation under general laws; change of laws; regulation

> "Section 2. Corporations may be formed under general laws, but shall not be created by special Acts. Laws relating to corporations may be altered, amended, or repealed at any time, and all corporations doing business in this State may, as to such business, be regulated, limited, and restrained by law."

The relatively scant authority on the question before us appears to uphold the decision below. Fletcher, in his treatise on Corporations, vol. 7, Perm.Ed., ch. 43, § 3677, at p. 852, says:

> "It has also been held that a constitutional or statutory provision that all charters and grants of or to corporations or amendments thereof shall be subject to amendment or repeal at the will of the legislature, unless a contrary intent is expressed, applies not

only to subsequent grants of original charters but also to extensions of pre-existing charters, for, while an extension of a charter merely continues the old corporation by giving it additional life, the giving of additional life to a corporation, beyond the period limited in its charter is a new grant and, in a sense, a new charter."

In Fower v. Provo Bench Canal & Irrigation Co., 99 Utah 267, 101 P.2d 375, 377 (1940), the Supreme Court of Utah quoted Fletcher, § 3677 supra, with approval, cited cases supporting the position, and concluded:

" * * * we have determined that the Constitution of Utah, the laws of Utah, and the Articles of Incorporation of defendant company, *all as written in 1937*, [date of renewal] constitute the agreement or contract between the corporation and its stockholders * * *." (Emphasis in original)

See also, Northern Bank of Kentucky v. Stone, 6 Cir., 88 F. 413 (1898), and Deposit Bank of Owenboro v. Daviess County, 102 Ky. 174, 39 S.W. 1030 (1897) aff'd 173 U. S. 663, 19 S.Ct. 875, 43 L.Ed. 850 (1897).

■ When a grant of existence is awarded a corporation, it is subject to the laws in existence at that time. 18 C.J.S. Corporations §§ 69–71. We hold that the right to renew, which vests no property rights, Wm. Warnock Co. v. H. D. Hudson Mfg. Co., 200 Minn. 196, 273 N.W. 710 (1937), 18 Am.Jur.2d Corporations § 69, when exercised, is, in effect, a renegotiation with the state and a renewal is a new grant of the privilege of fictitious existence. Accordingly, the new contract is subject to the laws of the life-giving entity in effect at that time.

The contrary position of the appellants here would render almost meaningless the twenty-five year limitation on existence placed in the original charter. We believe that limitations on the duration of corporate existence are calculated, in part, to avoid the Dartmouth result. The charter contract is a considerable privilege granted by the people to the fictitious entity created thereby. It seems both unnecessary and unreasonable to hold that a corporate charter divests a state of all future right to broaden or curtail corporate existence in the public interest when the corporate charter which it issued has a definite termination date.

■ We hold that the mandatory provisions of the Arizona Constitution and statutes are binding upon a corporation either formed after the enactment of such provisions, or renewed subsequent to such provisions although initially incorporated prior to such provisions. This does not make the passage of corporation laws retrospective; rather, it recognizes that when a corporation renews its existence it then breathes a new life which includes all laws then in effect.

The appellees have contended strenuously that even without the renewals of the corporate charter, the result would be the same, by reason of amendments to the articles of incorporation. In 1924, a charter amendment increased common stock from 1,000,000 shares to 1,500,000 shares; in 1954 an increase of 1,500,000 shares of preferred stock with full voting rights was authorized. Amendments in 1924 and 1958 substantially increased the corporate powers of Chief Consolidated. There is reputable authority that amendments of such substance constitute an acceptance of the then existing corporate law, thus avoiding the Dartmouth College result. 18 Am.Jur.2d Corporations § 94; Commonwealth ex rel. O'Shea v. Flannery, 203 Pa. 28, 52 A. 129 (1902).

In Dagg v. Hammons, 34 Ariz. 445, 272 P. 643, 72 A.L.R. 1237 (1928), a variation of this same contention was, however, rejected insofar as the constitutional provision (art. 14, § 11) imposing double liability on stockholders of a bank was concerned. In Dagg, the constitutional personal liability was imposed only upon the stock issued under a charter amendment enacted after the adoption of our Constitution. The reasoning leading us to the decision reach-

ed here precludes the necessity of our determining whether the awkwardness of the Dagg result would have to be imposed upon Chief Consolidated were there only the charter amendments before us.

Affirmed.

KRUCKER, C. J., and HATHAWAY, J., concur.